IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| YVONNE SHOCKLEY, | ) | Case No. 1:17-CV-2621 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |

## I.      Introduction

Plaintiff, Yvonne Shockley, seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her applications for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act.  This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).  Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision be AFFIRMED.

## II.      Procedural History

On November 11, 2012, Shockley applied for disability insurance benefits, and on February 13, 2013, she applied for supplemental security income.  (Tr. 482–89, 491–96).  She alleged that she became disabled on November 30, 2011, due to "fibromyalgia, nodules in thyroid, arthritis, degenerative disease, knee replacement, bursa shoulder, pinch nerve disk neck, depression, tipped tailbone, ulcers, hyatel hernia, and [mitral] valve prolapse."  (Tr. 326–27,

336–37, 483, 491).  The Social Security Administration denied Shockley's applications initially and upon reconsideration.  (Tr. 326–377).  Shockley requested an administrative hearing.  (Tr. 422).  Administrative Law Judge ("ALJ") Pamela Loesel heard Shockley's case on March 3, 2015, and denied her claim in an April 21, 2015, decision.  (Tr. 249–287, 381–92).  On May 18, 2016, the Appeals Council remanded Shockley's case for the ALJ to consider newly submitted evidence regarding her carpal tunnel syndrome and evaluate whether Shockley's obesity caused her to be disabled.  (Tr. 400–01).  The ALJ held a second hearing on August 2, 2016, and denied Shockley's claim in a September 14, 2016 decision.  (Tr. 209–20, 288–325).  Shockley requested further review by the Appeals Council and submitted new evidence.  (Tr. 8–195, 199).  The Appeals Council found that Shockley's newly submitted evidence would not affect the decision about whether she was disabled and denied review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1–4).  On December 18, 2017, Shockley filed a complaint to seek judicial review of the Commissioner's decision.  ECF Doc. 1.

III. **Evidence**

A. **Personal, Educational, and Vocational Evidence**

Shockley was born on April 14, 1963, and she was 48 years old on the alleged onset date.  (Tr. 483, 491).  She had a high school education.  ECF Doc. 13, Page ID# 1775.  She had past relevant work as a waitress, accounting clerk, and data entry operator.  ECF Doc. 13, Page ID# 1775; (Tr. 260–61, 315–19, 680–81).  Her transferrable skills included numerical record keeping, accounts payable, balancing ledgers, posting figures, financial reporting, and data entry.  (Tr. 281).

**B.     Relevant Medical Evidence—Physical**

On June 21, 2006, Jay Costantini, M.D., conducted an MRI of Shockley's upper spine. (Tr. 1051).  Dr. Costantini found that Shockley had an osteophyte[1] in two of her discs, minor bulging in two discs, and moderate degenerative decreased height in two discs.  (*Id.*).  Shockley had another MRI on March 4, 2010, and Alison Smith, M.D., determined that she had degenerative interspace changes with narrowing and irregularity in her upper spine.  (Tr. 1053). She had an x-ray on March 24, 2010, which revealed degenerative disc disease in her lower spine.  (Tr. 1055).

On April 2, 2010, Shockley saw Phillippe Berenger, M.D., for pain management and an epidural steroid injection.  (Tr. 619).  Dr. Berenger noted Shockley had a history of neck, shoulder, and upper extremity pain, fibromyalgia with sleep disturbance, anxiety, stress, depression, and thyroid nodules.  (*Id.*).  He noted that steroid injections and medications helped Shockley's pain in the past, but that she had no formal treatment for her fibromyalgia.  (*Id.*). Dr. Berenger noted that an MRI showed degenerative changes in Shockley's upper spine, and he diagnosed her with myalgia,[2] myositis,[3] and cervical spondylosis[4] without myelopathy.[5]

---

[1] An osteophyte is "an abnormal bony outgrowth or projection (such as one occurring near a joint affected by osteoarthritis)."  *Osteophyte*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/osteophyte (last visited Nov. 14, 2018).

[2] Myalgia is muscle pain.  *See Muscle Aches*, A.D.A.M. MEDICAL ENCYCLOPEDIA (2018), *available at* Nat'l Inst. of Health, MEDLINEPLUS, https://medlineplus.gov/ency/article/003178.htm (last visited Nov. 27, 2018).

[3] Myositis is an inflammation or swelling of the muscles, often caused by injury, infection, medication, or an autoimmune disorder.  *Myositis*, A.D.A.M. MEDICAL ENCYCLOPEDIA (2018), *available at* Nat'l Inst. of Health, MEDLINEPLUS, https://medlineplus.gov/ency/article/001245.htm (last visited Nov. 27, 2018).

[4] Cervical spondylosis is a degenerative disease of the spine, in which chronic wear on the cartilage discs between the vertebrae may cause compression on the spinal nerve roots and pain.  *See Spondylosis*, MERRIAM-WEBSTER, https://www.merriam-webster.com/medical/spondylosis (last visited Nov. 27, 2018); *Cervical Spondylosis*, A.D.A.M. MEDICAL ENCYCLOPEDIA (2018), *available at* Nat'l Inst. of Health, MEDLINEPLUS, https://medlineplus.gov/ency/article/000436.htm (last visited Nov. 27, 2018).

[5] Myelopathy is "a disease or disorder of the spinal cord or bone marrow."  *Myelopathy*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/myelopathy (last visited Nov. 27, 2018).

(Tr. 620).  Shockley's pain was reduced after she received the injections.  (*Id.*).  Shockley saw Dr. Berenger again on June 9, 2010, for her upper spine and shoulder pain.  (Tr. 614).  She rated her pain as an 8/10 and said that it radiated down to her fingertips.  (*Id.*).  On examination, Dr. Berenger noted that Shockley had 5/5 strength in her upper extremities, slight weakness in her right elbow, and no signs of nerve root damage.  (Tr. 615).  He found that Shockley had "moderately" and "mildly" narrowed disc spaces in her upper spine.  (*Id.*).  He diagnosed Shockley with brachial neuritis[6] or radiculitis,[7] and cervical spondylosis with myelopathy.  (*Id.*).  Dr. Berenger prescribed pain relievers and referred Shockley for a surgery consult.  (*Id.*).  On July 9, 2010, Dr. Berenger gave Shockley additional injections and noted that she was in less pain after.  (Tr. 623).  On June 4, 2013, Shockley told Dr. Berenger that she had 6/10 pain in her neck and left shoulder, and that it radiated down her left arm and fingers.  (Tr. 937, 1028).  On examination, Dr. Berenger noted that Shockley had no limitations to her range of motion in her upper spine, and that her gait was normal.  (Tr. 938, 1029).  He prescribed physical therapy and a nerve pain medication.  (Tr. 941, 1032).  On September 10, 2013, Dr. Berenger noted that Shockley said her medications helped her pain, and he continued her medications.  (Tr. 1417–18).

On April 27, 2010, Shockley saw nurse practitioner ("NP") Mary Patterson for evaluation for a chronic pain rehabilitation program.  (Tr. 858, 1234).  Shockley told Patterson that her pain ranged from 2/10 to 7/10, and that it got worse with work, sitting, stress, physical activity, extended lying down, and cold weather.  (*Id.*).  She said her pain decreased with change of

---

[6] Brachial neuritis is an inflammatory or degenerative lesion of a nerve, which is marked by pain, sensory disturbances, and impaired or lost reflexes, in the arms.  *See Brachial*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/brachial (last visited Nov. 27, 2018); *Neuritis*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/neuritis (last visited Nov. 27, 2018).

[7] Radiculitis is "inflammation of a nerve root."  *Radiculitis*, MERRIAM-WEBSTER, https://www.merriam-webster.com/medical/radiculitis (last visited Nov. 27, 2018).

position, movement, steroid injections, and over-the-counter pain medication.  (*Id.*).  Patterson noted that Shockley had been diagnosed with fibromyalgia in 2001, and that it was managed with physical therapy, medications, and relaxation.  (*Id.*).  She also noted that Shockley had spondylosis, carpal tunnel syndrome, mild degenerative disc disease, back and hip pain, and a bulging disc in her lower spine.  (Tr. 859, 1235).  Patterson noted that Shockley's back and hip pain was treated with trigger point injections, medication, and physical therapy.  (*Id.*).  She also reported that she missed work and had difficulty sleeping due to pain.  (Tr. 860, 1236).  Shockley told Patterson that her boyfriend, son, and daughter-in-law supported her.  (*Id.*).  On examination, Patterson noted that Shockley had good range of motion in her upper and lower spine, and that she had 12/18 fibromyalgia tender points.  (Tr. 861, 1237).  Patterson recommended that Shockley be admitted to the outpatient pain rehabilitation program.  (*Id.*).

Between October 7, 2010, and April 4, 2013, Shockley attended 24 physical therapy sessions.  (Tr. 886–87, 889–90, 892–93, 895–96, 900–01, 903–04, 906, 917, 1111–12, 1118, 1122–23, 1127, 11131, 1135, 1138–39, 1142–43, 1147, 1150, 1155, 1161, 1163–64, 1167, 1170, 1172).  Shockley's physical therapists noted that she had consistent progress in decreasing her pain and improving her gait, activity tolerance, and independence.  (Tr. 893, 896, 901, 904, 906, 1111–12, 1118, 1123, 1127, 1131, 1143, 1147, 1161, 1163–64, 1167, 1170).  She reported doing yardwork, shoveling, and moving furniture in 2010 and early 2011, and in October 2012 she told her physical therapist that her goal was "to be able to return to belly dancing and hula-hooping." (Tr. 1118, 1135, 1142, 1155).  Nonetheless, Shockley continued to have limitations due to pain and swelling in her knees in April 2013, and she reported having 7/10 pain after "overdoing weight bearing activities" on April 4, 2013.  (Tr. 886–87, 890).  Shockley attended nine additional physical therapy sessions between July 9, 2013, and February 4, 2014, and her

5

therapists noted that she progressed well, improved her range of motion, and improved her gait quality.  (Tr. 1374, 1379–80, 1382–83, 1386–87, 1390–91, 1393–94, 1402, 1406–07, 1435).

On February 27, 2012, Shockley saw Seth Gasser, M.D., for her knee pain.  (Tr. 856).  Shockley reported that she had significant degenerative changes in her leg, recurrent swelling, and discomfort.  (*Id.*).  She said she iced her leg and went to therapy.  (*Id.*).  Dr. Gasser noted that Shockley had mild stiffness, swelling, and tenderness in her leg, and he gave her a pain reliever injection.  (*Id.*).

On June 5, 2012, Nabil Tadross, M.D., noted that Shockley's fibromyalgia had gotten worse, and that she had pain and swelling in her left knee.  (Tr. 945, 947).  Dr. Tadross continued Shockley's medications and referred her for a knee surgery consultation.  (Tr. 947).  On November 20, 2012, Shockley told Dr. Tadross that she had pain in her right knee, but her left knee was doing much better after surgery.  (Tr. 991).  On January 16, 2013, Dr. Tadross noted that Shockley had normal range of motion and strength in her extremities, and that her joints were stable without swelling.  (Tr. 1006).  Dr. Tadross continued Shockley's pain medication for fibromyalgia.  (*Id.*).  On September 18, 2013, Dr. Tadross noted that Shockley should cut back on her pain relievers.  (Tr. 1423).  At a follow-up on January 16, 2015, Dr. Tadross noted that Shockley had some swelling in her legs, and prescribed medication.  (Tr. 1494).  On January 27, 2015, Dr. Tadross noted that the swelling in Shockley's legs had resolved.  (Tr. 1486–87).

On June 5, 2012, Michael Kolczun, M.D., aspirated[8] Shockley's left knee and gave her a steroid injection to help relieve her pain and swelling.  (Tr. 954).  On July 12, 2012, Dr. Kolczun performed diagnostic surgery on Shockley and determined that she had degenerative arthritis in

---

[8] Aspiration is the withdrawal of fluid, tissue, or other matter from the body through suction.  *See Aspiration*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/aspiration#medicalDictionary (last visited Nov. 27, 2018).

her left knee.  (Tr. 864, 1260).  He stated that Shockley could benefit from partial knee

resurfacing.  (Tr. 865, 1261).  On August 7, 2012, Dr. Kolczun recommended that Shockley

receive a partial knee resurfacing, and she had the surgery on October 8, 2012.  (Tr. 973–74,

987).  At a follow-up on November 8, 2012, Shockley told Dr. Kolczun that her pain was a 0/10

"a lot of the time" and that she only took an occasional pain pill.  (Tr. 987).  Dr. Kolczun noted

that Shockley had minimal swelling, excellent range of motion without irritability, and a

"relatively normal gait without assistive devices."  (*Id.*).  On November 27, 2012, Shockley told

Dr. Kolczun that she had discomfort and swelling in her right knee, but that she was able to

increase her activities without difficulty.  (Tr. 998).  Dr. Kolczun noted that she had full range of

motion in both knees, with "some tightness at extremes," and he gave her a steroid injection in

her right knee.  (Tr. 998–99).  On February 5, 2013, Shockley told Dr. Kolczun that she had 5/10

pain in her right knee, 8/10 pain in her left knee, and that her November 2012 injection did not

help her knee pain.  (Tr. 923, 1011).  On March 7, 2013, Dr. Kolczun performed a

meniscectomy[9] on Shockley's right knee and determined that a partial resurfacing would be

necessary due to arthritis.  (Tr. 1262–63).  On June 25, 2013, Shockley told Dr. Kolczun that her

medications did not relieve her symptoms and that she wanted to proceed with surgery.

(Tr. 1365).  Dr. Kolczun performed the partial resurfacing surgery on July 9, 2013.  (Tr. 1264–

65).

On March 4, 2013, Shockley told physician's assistant ("PA") Nicole Mitchell that she

could walk a block or two on level ground and take care of herself.  (Tr. 914, 1019).  Mitchell

noted that Shockley had full range of motion.  (Tr. 916, 1021).

---

[9] A meniscectomy is a "surgical excision of a meniscus of the knee or temporomandibular joint."
*Meniscectomy*, MERRIAM-WEBSTER, https://www.merriam-webster.com/medical/meniscectomy (last
visited Nov. 27, 2018).

On March 27, 2013, PA Denise Scotch noted that Shockley was doing well after her surgery, was able to get out of a chair with no problems, and ambulated with a normal brisk gait. (Tr. 1210).  Scotch continued Shockley's physical therapy and stated that right knee aspiration and injection might be considered later.  (Tr. 1211).  At a follow-up on April 10, 2013, Scotch noted that Shockley had "very little" discomfort in her left knee, and that she had continued discomfort, swelling, and stiffness in her right knee.  (Tr. 1214).  Scotch noted that Shockley had a relatively normal gait, but that she walked with a slight limp on startup.  (Tr. 1215).  Scotch aspirated Shockley's right knee and gave her a steroid injection.  (*Id.*).  At a follow-up on August 27, 2013, Scotch noted that Shockley was doing well, had immediate relief of her symptoms after aspiration of her knee, and she was able to rise from a chair without difficulty.  (Tr. 1410–11).  Scotch noted that Shockley used a cane on occasion.  (Tr. 1410).  On November 5, 2013, Scotch noted that Shockley had excellent range of motion in her knees, no swelling, no instability, and a "perfectly normal gait."  (Tr. 1431).  On August 28, 2014, Scotch noted that Shockley was doing well and had "no real knee pain complaints other than achiness from time to time."  (Tr. 1513).  Shockley had a good range of motion, and she was able to walk with a normal brisk gait.  (Tr. 1514).

On October 14, 2013, Shockley saw Eric Pioro, M.D., for a neurologic consultation. (Tr. 1057, 1240).  On examination, Dr. Pioro noted that Shockley had multiple tender points on light palpation above and below the waist, an antalgic gait,[10] no evidence of active denervation, mild to moderate neurogenic changes in her muscles, no evidence of carpal tunnel syndrome, minimal bulging in her lower spine, and mildly narrowed disc spaces in her upper spine.

---

[10] An antalgic gait is an unnatural gait used to minimize or alleviate pain or discomfort.  *See Antalgic*, MERRIAM-WEBSTER, https://www.merriam-webster.com/medical/antalgic (last visited Nov. 14, 2018).

(Tr. 1059–61, 1242–44).  Dr. Pioro diagnosed Shockley with lumbago,[11] cervicalgia,[12] arthritis in the knee, limb pain, disturbance of skin sensation, and headache.  (Tr. 1061, 1244).  Dr. Pioro noted that an MRI on November 7, 2013, revealed "very minimal degenerative spondylosis without significant stanoses," and that the bulging discs in Shockley's were minimal to mild. (Tr. 1070–71).  He determined that there was no evidence of polyneuropathy[13] or radiculopathy[14] in her lower spine, and that her pain was related to fibromyalgia.  (Tr. 1071).

On March 6, 2014, PA Daniel Basinski noted that Shockley denied any instability in her left knee, or difficulty bending it; however, she stated that putting pressure on her knee was painful.  (Tr. 1455).  Basinski noted that Shockley's left knee was swollen and prescribed an anti-inflammatory medication.  (Tr. 1456).

On August 13, 2014, Domingo Gonzalez, M.D., noted that Shockley had limited motion in any direction in her upper spine and pain in her upper and lower spine on bending.  (Tr. 1540). He stated that Shockley's gait, strength, and coordination were normal.  (*Id.*).  He found that Shockley had 16 of the 18 fibromyalgia tender points.  (*Id.*).  Dr. Gonzalez recommended that Shockley receive pain management.  (Tr. 1541).

From September 2, 2014, to November 9, 2015, Shockley saw Sunjay Mathur, M.D., for pain management.  (Tr. 1517–19, 1521-23, 1525–31, 1533–35, 1537–39, 1543, 1549,1561–62,

---

[11] Lumbago is "acute or chronic pain (such as that caused by muscle strain) in the lower back."  *Lumbago*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/lumbago (last visited Nov. 27, 2018).

[12] Cervicalgia is discomfort or pain in the neck, related to the vertebrae or discs in the upper spine. *See Neck Pain*, A.D.A.M. MEDICAL ENCYCLOPEDIA (2018), *available at* Nat'l Inst. of Health, MEDLINEPLUS, https://medlineplus.gov/ency/article/003025.htm (last visited Nov. 27, 2018).

[13] Polyneuropathy is "a disease of the nerves."  *Polyneuropathy*, MERRIAM-WEBSTER, https://www.merriam-webster.com/medical/polyneuropathy (last visited Nov. 27, 2018).

[14] Radiculopathy is "irritation of or injury to a nerve root (as from being compressed) that typically causes pain, numbness, or weakness in the part of the body which is supplied with nerves from that root." *Radiculopathy*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/radiculopathy (last visited Nov. 27, 2018).

1564–65, 1568, 1637–57).  On September 2, 2014, Dr. Mathur noted that Shockley's neck pain had not improved with anti-inflammatories or physical therapy, and he stated that her opioid prescriptions might be doing her more harm than good.  (Tr. 1538).  He recommended that Shockley perform daily aerobic exercises to manage her fibromyalgia.  (*Id.*).  On September 30, 2014, Dr. Mathur noted that an MRI revealed arthritis in Shockley's upper spine and that a steroid injection might help.  (Tr. 1534, 1549).  On October 21, 2014, Shockley told Dr. Mathur that she had pain in both her hands, and that lifting or doing chores made her pain worse.  (Tr. 1528).  Dr. Mathur diagnosed Shockley with carpal tunnel syndrome and refereed her for steroid injections in her upper spine and wrists.  (Tr. 1529).  Dr. Mathur recommended additional steroid injections in Shockley's wrists on October 24, 2014, December 10, 2014, January 27, 2015, February 3, 2015, and he recommended nerve blocks in her spine on November 4, 2014, and February 25, 2015.  (Tr. 1518, 1522, 1543, 1561, 1564–65).  On February 25, 2015, Dr. Mathur recommended that Shockley seek a consultation for carpal tunnel release surgery.  (Tr. 1518).  In August, September, and October 2015, Dr. Mathur noted that Shockley had a non-antalgic gait and did not require any assistive devices to walk.  (Tr. 1640, 1647, 1653).  Throughout pain management sessions, Dr. Mathur consistently recommended that she continue with home exercises and physical therapy to manage her pain and fibromyalgia.  (Tr. 1521, 1526, 1529, 1533–34, 1641, 1654).

On December 11, 2014, Shockley was discharged from physical therapy for noncompliance, because she had only attended three sessions and cancelled five scheduled appointments.  (Tr. 1572).  The physical therapist noted that Shockley had not made any progress due to her noncompliance.  (*Id.*).

On December 18, 2014, Anu Suri, M.D., noted that Shockley felt winded sometimes, and could walk a half a block before she had to stop to catch her breath.  (Tr. 1498).  Shockley told Dr. Suri that she was able to walk a mile on a level surface before being admitted to the hospital for shortness of breath.  (*Id.*).  On examination, Dr. Suri noted that Shockley's lungs were clear, and she had no wheezing.  (*Id.*).  Dr. Suri determined that Shockley's shortness of breath was related to her recent pneumonia and instructed her not to resume smoking.  (Tr. 1498–99).  On January 29, 2015, Dr. Suri noted that Shockley had noticed improvement with her leg swelling, and that her breathing had also improved.  (Tr. 1481).  Shockley told Dr. Suri that she could walk "more than a block," cook, and clean without limitation, but she felt tired by the end of the day.  (*Id.*).  She denied having any joint pain.  (*Id.*).

On March 9, 2015, Shockley had carpal tunnel release surgery.  (Tr. 1552).  At post-surgery discharge, Gal Hazen, M.D., noted that Shockley's carpal tunnel syndrome was improved.  (Tr. 1553).  On August 2015, Fredrich Dengel, M.D., conducted an MRI of Shockley's wrists, noted that there were no problems in the post-operative site except for some soft tissue swelling, and stated that the carpal tunnel contents were "unremarkable."  (Tr. 1659).

On February 18, 2016, Shockley saw Dina Boutros, M.D., for a follow-up regarding a headache and vomiting.  (Tr. 1606).  Dr. Boutros noted that Shockley's dizziness had decreased, and that the changing weather made her fibromyalgia and pain worse.  (*Id.*).  She also noted that Shockley was accompanied by her grandson, whom she was babysitting.  (*Id.*).  Dr. Boutros noted that Shockley's upper and lower extremities had full strength and normal tone, and that her gait was normal.  (Tr. 1613).

On March 4, 2016, Shockley saw Feyrouz Al Ashkar, M.D., for a rheumatologic evaluation.  (Tr. 1615).  On examination, Dr. Ashkar noted that Shockley had no joint

11

deformities, full range of motion without pain in her shoulders and hips, no instability in her upper and lower extremities, full motor strength, and a normal gait without assistive devices. (Tr. 1622–23).  Dr. Ashkar determined that Shockley had no evidence of inflammatory arthropathy,[15] inflammatory myositis, or systemic rheumatologic disease.  (Tr. 1623). Dr. Ashkar recommended that Shockley make healthy lifestyle changes, including diet, exercise, stress management, and sleep.  (Tr. 1624).

### C.    Relevant Medical Evidence—Mental Health

On October 11, 2010, Shockley saw Said Haidar, M.D., for anxiety and depression. (Tr. 827).  Shockley told Dr. Haidar that she had trouble sleeping, decreased motivation, isolation, social withdrawal, decreased confidence and self-esteem, decreased concentration and memory, and panic attacks.  (*Id.*).  She said that she did well on antidepressants, but she stopped taking them.  (*Id.*).  Dr. Haidar noted that Shockley was pleasant and cooperative, and that she had good concentration, memory, abstract thinking, fund of knowledge, insight, and judgment. (Tr. 828).  He diagnosed Shockley with major depression and severe PTSD,[16] and gave her a global asset of functioning ("GAF") score of 35 to 40.[17]  (*Id.*).  On October 18, 2010, Dr. Haidar

---

[15] Arthropathy is "a disease of a joint."  *Arthropathy*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/arthropathy (last visited Nov. 27, 2018).

[16] "Post-traumatic stress disorder (PTSD) is a type of anxiety disorder.  It can occur after [a person has] gone through an extreme emotional trauma that involved the threat of injury or death."  *Post-Traumatic Stress Disorder*, A.D.A.M. MEDICAL ENCYCLOPEDIA (2018), *available at* Nat'l Inst. of Health, MEDLINEPLUS, https://medlineplus.gov/ency/article/000925.htm (last visited Nov. 27, 2018).

[17] The global assessment of functioning is a scale used to report an individual's overall functioning at a particular point in time.  AM. PSYCH. ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 30 (4th ed. 2000).  A score in the range of 31 to 40 indicates "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)."  *Id.*  A score in the range of 71 to 80 indicates that "if symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupation, or school functioning (e.g., temporarily falling behind in schoolwork).  *Id.*

noted that Shockley was compliant with her medication, but she did not show a treatment response.  (Tr. 826).  Shockley reported that her domestic skills were normal, she socialized less with family and friends, her work performance was normal, and she was hypervigilant and anxious.  (*Id.*).  Dr. Haidar did not note any signs of anxiety during the examination, and that her cognitive functioning was normal.  (*Id.*).  On November 18, 2010, Dr. Haidar noted that Shockley had normal self-care and domestic skills, reduced relationships with family and friends, normal performance at work, well-controlled anger, no signs of anxiety, and intact cognitive functioning.  (Tr. 824).  On January 31, 2011, Shockley told Dr. Haidar that she had a setback, felt sad and worthless, had decreased sociability, and had difficulty concentrating and making decisions.  (Tr. 823).  Dr. Haidar noted that she was compliant with medication, had normal self-care and domestic skills, had normal work performance, and did not have signs of anxiety or attention difficulty.  (*Id.*).

Shockley received psychological counseling from September 2013 through September 2014.  (Tr. 1465–79).  On September 24, 2013, nurse Felicia Fior-Nossek diagnosed Shockley with major depressive disorder.  (Tr. 1478).  On examination, Fior-Nossek noted that Shockley was cooperative, alert, oriented, depressed, angry, irritable, and anxious.  (*Id.*).  She indicated that Shockley had brief concentration, normal speech, average IQ, normal/goal-directed thought processes, fair judgment and insight, and normal memory.  (*Id.*).  Over the course of her counseling, Fior-Nossek indicated that Shockley's psychological symptoms were mild to minimal and that she had a fair to good prognosis, except that her symptoms were moderately severe on June 30, 2014, and "worsened" on July 21, 2014.  (Tr. 1458–75).

From February 19, 2016, through July 11, 2016, Shockley attended individualized therapy.  (Tr. 1667–1716).  At a counseling session on April 22, 2016, Shockley told her

therapist that she planned to sell her house and move on her own into an apartment after she ended her relationship with her boyfriend.  (Tr. 1714).  On April 29, 2016, Shockley said that she worked "really hard" as a nanny for three different families and wanted to make time for her photography and crafts.  (Tr. 1712).  On May 13, 2016, she said that she was nervous about having enough money to pay rent because the family she nannied for was not able to pay her $1,000 per month.  (Tr. 1710).  On May 20, 2016, Shockley told her therapist that "her job as a caregiver for small children [made] her feel appreciated [and] successful."  (Tr. 1706).

### D.    Relevant Opinion Evidence

#### 1.    Treating Physician—Nabil Tadross, M.D.

On March 3, 2015, Dr. Tadross wrote a letter stating that Shockley was "unable to work due to fibromyalgia and neck pain," and that she would have injections for her neck and hand surgery within the following month.  (Tr. 1665).  Dr. Tadross wrote another letter on January 11, 2016, stating that Shockley was "currently unable to work due to fibromyalgia and neck pain." (Tr. 1666).

#### 2.    Consultative Examiner—Hassan Assaf, M.D.

On February 12, 2013, Shockley saw Hasan Assaf, M.D., for a consultative examination. (Tr. 869).  Shockley told Dr. Assaf she had fibromyalgia, diffuse and fleeting joint pain and muscle pain, migraines, lower back pain, degenerative joint disease in her back, knee pain, shoulder pain when she carried things with her left arm, and thyroid nodules.  (Tr. 869–70).  Dr. Assaf noted that Shockley had a knee replacement in 2012, and epidural injections for her lower back pain.  (Tr. 870).  Shockley told Dr. Assaf she cooked three times a week; but she did not clean, do laundry, or shop because her boyfriend did those chores; she showered three to four times per week and dressed herself; she watched television, listened to the radio, and read; and

she socialized with friends. (Tr. 871). On examination, Dr. Assaf noted that Shockley walked

with an antalgic gait, could not walk on heels and toes due to knee pain, had a limited squat, had

a normal stance, used a cane for long walks outdoors, and was able to rise from a chair without

difficulty. (*Id.*). He observed trigger points on Shockley's lower neck, over both knees, over her

left shoulder, and over her left elbow. (Tr. 872). Dr. Assaf opined that Shockley required a cane

to walk long distances, and that she had marked restrictions in prolonged walking, bending,

pushing, pulling, and lifting. (Tr. 871, 873).

### 3. Consultative Psychologist—Thomas Evans, Psy.D.

On February 28, 2013, Shockley saw Thomas Evans, Ph.D., for a psychological

consultative evaluation. (Tr. 880). Dr. Evans noted that Shockley was cooperative and friendly

throughout the evaluation. (*Id.*). Shockley told Dr. Evans that she got along well with

coworkers when she worked, she had "never had any psychiatric symptoms that affected her at

work", and she had no difficulty taking directions from supervisors or handling workplace stress.

(Tr. 881). She told Dr. Evans that she received mental health counselling for 25 years and that

she was frequently irritable, but she denied any depression. (Tr. 881–82). Shockley said that she

could drive short distances, and that on a typical day she stretched, showered, walked, cooked

meals, cleaned the house, did dishes, ran errands, and went to doctor appointments or therapy.

(Tr. 882). Dr. Evans noted that Shockley had a "slight limp," a "mildly reduced" walking pace,

and "some difficulties" getting out of a chair at the interview. (*Id.*). On examination, Dr. Evans

noted that Shockley had normal speech, thought, and mood. (*Id.*). She had no anxiety or

psychosis, her insight and judgment were adequate, and she displayed good attention and

concentration. (Tr. 883–84). Dr. Evans determined that Shockley did not meet any criteria for a

psychiatric diagnosis, and she had a GAF score of 80. (*Id.*).

### 4. State Agency Consultant—Physical Limitations

On February 19, 2013, state agency consultant Gerald Klyop, M.D., reviewed Shockley's medical records and determined that she had the residual functional capacity to perform her past relevant work as actually performed.  (Tr. 332–34, 342–44).  Dr. Klyop opined that Shockley could occasionally lift or carry up to 20 pounds, frequently lift or carry up to 10 pounds, stand or walk for 4 hours in an 8-hour workday, and sit for up to 6 hours in an 8-hour workday.  (Tr. 332, 342).  He stated that she could occasionally climb ramps, stairs, ladders, ropes and scaffolds; occasionally kneel, crouch, and crawl; frequently stoop; and balance without limitation. (Tr. 332–33, 342–43).  He stated that Shockley was limited in reaching overhead with her left arm, but that she was unlimited in handling, fingering, and feeling.  (Tr. 333, 343).  On July 23, 2013, Maureen Gallagher, D.O., concurred with Dr. Klyop's findings.  (Tr. 357–59).

### E. Relevant Third-Party Statement

On March 3, 2015, Shockley's boyfriend, Ralph O'Connor, wrote a letter regarding her physical and mental health.  (Tr. 583).  O'Connor stated that Shockley's deteriorating mental and physical health caused her to give up crafts, gardening, housework, and cooking.  (*Id.*).  He stated that Shockley had daily pain and transformed from an independent person to someone who depends on others.  (*Id.*).

### F. Relevant Testimonial Evidence

Shockley testified at the ALJ hearing.  (Tr. 295–313).  Shockley stated that she last worked at a pizza restaurant in November 2011, and she worked as an accounting assistant at a bank before that.  (Tr. 298).  She was quickly promoted to senior accounting clerk at the bank. (Tr. 299).  As an accounting clerk, Shockley sat for six to seven hours per day, lifted "heavy"

boxes full of reports and invoices, and typed on a keyboard.  (*Id.*).  Keyboarding bothered her. (*Id.*).

Shockley testified that she had: (1) arthritis, degenerative discs, and slipped discs in her upper spine; (2) pain in her lower back; (3) sharp pain when she walked; (4) swelling and pain in her knees; (5) pain and soreness in her hands and elbows; and (6) headaches.  (Tr. 300–06).  She stated that her back issues caused pain and numbness that radiated down to her shoulders and fingertips, she could not move her neck or sleep, and her tailbone and legs went numb when she sat too long.  (Tr. 300–02).  Getting out of bed made her pain worse, she had to elevate her legs, and she iced her knees to keep the swelling down.  (Tr. 305–06).  Her headaches lasted up to two days, and she could not identify any triggering factors or predict when they would occur. (Tr. 309–10).  To reduce her pain, Shockley used an electrical nerve stimulation unit, pain relieving cream and gel, physical therapy, steroid injections, psychiatric treatment, and opioid pain relievers.  (Tr. 302–04).  She also tried losing weight to reduce the strain on her knees and used a flex ball to strengthen them, but it made her knees swell and she had to get them drained. (Tr. 305–06).  Her treatments did not eliminate her pain, and her medications made her unable to concentrate, tired, sleepy, cranky, uncomfortable, and moody.  (Tr. 304).  She had carpal tunnel surgery, which helped "very little," and she would soak her hands in water to keep the swelling down.  (Tr. 307–08).  She stated that she was trying to get contacts, which she thought would reduce her falling and headaches.  (Tr. 312).  Shockley stated that managing her symptoms was difficulty because she would take care of one issue, and then something else hurt.  (Tr. 312–13).

Shockley testified that she depended on her ex-boyfriend, neighbors, "girlfriend," and daughter to help her with her daily living activities.  (Tr. 301, 308).  Her ex-boyfriend did the chores at her house (cooking, cleaning, and laundry), sat with her when she showered in case she

fell, and helped her get dressed. (Tr. 296–97). She could fold laundry and went grocery shopping with her ex-boyfriend, but she held onto the cart to keep herself from falling. (Tr. 297). Her neighbor came over to "let her vent" and to help with chores. (Tr. 311). Shockley stated that she had issues dropping things like mugs, plates, and jars; she had difficulty grasping door knobs, opening jars, and holding a gardening hose; and she no longer lifted things or cooked because she was afraid of causing damage or a fire. (Tr. 297, 306, 308, 311, 313). She quit driving because she did not want to drive while medicated, had trouble reaching, turning the steering wheel hurt, and could not turn her head to look around. (Tr. 297, 302, 305). She could not type for more than five or ten minutes, it took her an hour to send an email, and she bought a wireless mouse and tried teaching her ex-boyfriend to type for her. (Tr. 307–08). She had trouble brushing her teeth because she could not bend to spit into the sink. (Tr. 301). Shockley did not walk much anymore because she could not hold onto her cane to balance, she had trouble climbing stairs, and she fell on any surface that was not concrete or asphalt. (Tr. 301, 312). She could force herself to sit for up to 25 minutes in the car to the hearing, but her legs were numb and "felt like jelly" after. (Tr. 312). She had to stand because sitting made her "tingly," but she stated that she would not stand in one position because "it hurt[] to stand." (Tr. 306, 312). She stated that depending on others made her depressed, and that she cried when she got out of bed on the morning of the hearing because she "hurt so bad." (Tr. 301, 308).

Kathleen Reiss, a vocation expert ("VE"), also testified at the hearing. (Tr. 313–??). The VE testified that Shockley had prior work as a waitress, data entry operator, and accounting clerk. (Tr. 315–319). The ALJ asked the VE whether a hypothetical individual with the same age, education, and past work as Shockley could perform work, if that individual were:

> able to occasionally lift and carry 20 pounds and frequently lift and carry 10
> pounds. Is able to stand and walk four hours of an eight hour workday. Is able to

> sit for six hours of an eight hour workday.  Push and pull would be limited in both
> lower extremities to occasional pedals bilaterally.  This individual can
> occasionally climb ramps and stairs.  Can never climb ladders, ropes or scaffolds,
> and can frequently stoop, occasionally kneel, crouch, and crawl, and would have
> limited left overhead reaching to occasional.

(Tr. 319–20).  The VE testified that such an individual could perform Shockley's past work as an

accounting clerk and data entry operator, but not as a waitress.  (Tr. 320).  The VE testified that,

if the above-described individual were also able to frequently handle and finger bilaterally, she

would be able to work as an accounting clerk, but not as a data entry operator.  (*Id.*).  The VE

testified that if the above-described individual would be absent from work, leave work early, or

come in late four days per month, she would not be able to work.  (Tr. 320–21).  The VE testified

that, if the individual described in the first two questions were off task 20% of the time due to

issues with chronic pain and medication side effects, she would not be able to work.  (Tr. 321).

The ALJ asked the VE whether a hypothetical individual with the same age, education,

and past work as Shockley could perform work, if that individual were:

> able to occasionally lift and carry ten pounds and frequently lift and carry five
> pounds.  Is able to stand and walk two hours of an eight hour workday.  Is able to
> sit for six hours of an eight hour workday.  Push and pull would be limited in both
> lower extremities to occasional pedals bilaterally.  This individual could
> occasionally climb ramps and stairs.  Could never climb ladders, ropes, or
> scaffolds.  Could occasionally stoop, kneel, crouch, and crawl, and would have
> limited left overhead reaching to occasional.

(Tr. 321).  The VE testified that such an individual could work as an accounting clerk.  (Tr. 322).

The VE testified that if that individual were able to frequently handle and finger bilaterally, she

could work as an accounting clerk.  (*Id.*).  If that individual would be absent from work, leave

early, or come in late for three or four days per month, she would not be able to work.  (*Id.*).  If

the hypothetical individual were off task 20% of the time due to chronic pain or medication side

effects, she would not be able to work.  (*Id.*).

Shockley's attorney asked the VE whether the ALJ's second hypothetical worker (question #5), could work if she were additionally limited to occasional reaching in front, overhead, and bilaterally and occasional handling and fingering bilaterally.  (Tr. 323).  The VE testified that such an individual could not work.  (Tr. 323–24).  Shockley's attorney asked the VE whether the hypothetical individual could work if she were limited to simple, routine tasks because of chronic pain and side effects.  (Tr. 324).  The VE testified that such an individual could not work.  (*Id.*).

**IV.    The ALJ's Decision**

The September 19, 2016, ALJ decision found that Shockley was not disabled and denied her applications for disability insurance benefits and supplemental security income.  (Tr. 209–20).  The ALJ determined that Shockley had not engaged in substantial gainful activity since November 30, 2011.  (Tr. 211).  The ALJ found that Shockley had "the following severe impairments: degenerative disc disease (cervical and lumbar), degenerative arthritis (right knee and left shoulder), fibromyalgia, carpal tunnel syndrome, and obesity."  (Tr. 212).  The ALJ determined that Shockley did not provide sufficient evidence to show that her tobacco use, high cholesterol, history of carpal tunnel syndrome, and major depressive disorder were severe.  (*Id.*).  The ALJ also determined that Shockley had no impairment or combination of impairments that met or medically equaled the severity of any of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1.  (Tr. 213–14).

The ALJ determined that Shockley had the RFC to perform sedentary work, except that she was:

> able to occasionally lift and carry ten pounds and frequently lift and carry five pounds, [was] able to stand and walk two hours of an eight-hour workday, [was] able to sit for six hours of an eight-hour workday, push and pull [was] limited in both lower extremities to occasional pedals bilaterally; occasionally climb ramps

> and stairs; never climb ladders, ropes, or scaffolds; occasionally stoop, kneel, crouch, and crawl; limited left overhead reaching to occasional; can frequently handle and finger bilaterally.

(Tr. 215).

In assessing Shockley's RFC, the ALJ explicitly "considered all symptoms" in light of the medical and other evidence in the record. (Tr. 215). The ALJ stated that Shockley's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the ALJ found that Shockley's complaints regarding the intensity, persistence, and limiting effects of her symptoms were "not entirely consistent with the medical evidence and other evidence in the record." (Tr. 216). Specifically, the ALJ stated that Shockley's allegation that she was generally limited from standing or walking due to pain was inconsistent with her previous statements that she could walk about a mile on a level surface, treatment notes encouraging cardio-exercise, and notes that she generally ambulated well. (Tr. 218). Further, the ALJ found that her claims that she no longer socialized and relied on others to do household activities were inconsistent with treatment notes indicating that she had begun watching other people's children during the relevant period and planned to get an apartment on her own after ending her relationship with her boyfriend. (*Id.*). In evaluating Shockley's subjective symptom complaints, the ALJ explicitly considered: (1) Shockley's testimony regarding her symptoms, her treatment efforts, the effects of her medication, and her daily living activities; (2) a written statement from Shockley's boyfriend supporting her allegations; and (3) objective medical evidence regarding her back and right knee impairments, neck and shoulder impairments, carpal tunnel syndrome, obesity, and fibromyalgia. (Tr. 215–18).

Because the ALJ found Shockley was unable to perform all or substantially all of the requirements of sedentary work, she relied on the VE's testimony to determine whether Shockley could perform a significant number of other jobs.  (Tr. 219).  Based on the VE's testimony and considering Shockley's RFC, age, education, and experience, the ALJ found that Shockley was able to perform her past relevant work as an accounting clerk.  (*Id.*).  In light of her findings, the ALJ determined that Shockley was not disabled from November 30, 2011, through the date of her decision and denied Shockley's applications for disability insurance benefits and supplemental security income.  (Tr. 220).

## V.    Law & Analysis

### A.    Standard of Review

The court's review is limited to determining whether the ALJ applied proper legal standards and reached a decision supported by substantial evidence.  42 U.S.C. §§ 405(g), 1383(c)(3); *Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence is any relevant evidence, greater than a scintilla, that a reasonable person would accept as adequate to support a conclusion.  *Rodgers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Under this standard of review, a court cannot decide the facts anew, make credibility determinations, or re-weigh the evidence.  *See* 42 U.S.C. §§ 405(g), 1383(c)(3) (providing that, if the Commissioner's findings as to any fact are supported by substantial evidence, those findings are conclusive); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003) ("Upon review, we are to accord the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which we do not, of observing a witness's demeanor when testifying.").  Even if the court does not agree with the Commissioner's decision, or substantial

22

evidence could support a different result, the court must affirm if the Commissioner's findings are reasonably drawn from the record and supported by substantial evidence. *See Elam*, 348 F.3d at 125 ("The decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Rogers*, 486 F.3d at 241 ("[I]t is not necessary that this court agree with the Commissioner's finding, as long as it is substantially supported in the record."). This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without risking being second-guessed by a court. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Though the court's review is deferential, the court will not uphold the Commissioner's decision if the ALJ failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, however, we review decisions of administrative agencies for harmless error. Accordingly, . . . we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." (citations and quotation omitted)). Furthermore, the court will not uphold a decision, even when supported by substantial evidence, when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS

157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).  Requiring an accurate and logical bridge ensures that a claimant will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to supplemental security income or disability benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P; (4) if not, whether the claimant can perform his past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy.  20 C.F.R. §§ 404.1520(a)(4)(i)–(v), 416.920(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006).  The claimant bears the ultimate burden to produce sufficient evidence to prove that he is disabled and, thus, entitled to benefits.  20 C.F.R. §§ 404.1512(a), 416.912(a).

### B.  Shockley's Subjective Symptom Complaints

Shockley argues that the ALJ failed to apply proper legal procedures and reach a conclusion supported by substantial evidence in determining that her allegations concerning the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the objective medical and other evidence in the record.  ECF Doc. 13, Page ID# 1781–86.  She asserts that the ALJ did not properly evaluate her pain and fibromyalgia allegations, and that the

24

ALJ did not provide sufficient analysis of the regulatory factors to explain the reasons for rejecting her subjective complaints. *Id.* Furthermore, Shockley contends that the ALJ's decision to reject her subjective complaints was not supported by substantial evidence, because her complaints were consistent with evidence in the record. *Id.* at 1784–85. The Commissioner responds that the ALJ applied proper legal procedures and reached a decision supported by substantial evidence in rejecting Shockley's subjective symptom complaints to the extent that they were inconsistent with the objective medical and other evidence, and that the ALJ's RFC assessment adequately accounted for the alleged limitations that were consistent with the record evidence. ECF Doc. 15, Page ID# 1796–1800.

At Step Four of the sequential analysis, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. §§ 404.1520(e), 416.920(e); The RFC is an assessment of a claimant's ability to do work despite his impairments. *See Her v. Comm'r*, 203 F.3d 388 (6th Cir. 1999) ("The determination of a claimant's Residual Functional Capacity is a determination based upon the severity of his medical and mental impairments."). Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant. 20 C.F.R. §§ 404.1529(a), 416.929(a).

A claimant's subjective symptom complaints may support a disability finding only when objective medical evidence confirms the alleged severity of the symptoms. *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989). Generally, a claimant must show that: (1) there is evidence underlying medical condition that causes the allege symptoms; and (2) either (a) objective medical evidence confirms the severity of the alleged pain, or (b) the objectively determined medical condition is so severe that it can be reasonably expected to cause the alleged pain. *Id.* (citing *McCormick v. Sec'y of Health & Hum. Servs.*, 861 F.2d 998, 10003 (6th Cir.

1988), and *Duncan v. Sec'y of Health & Hum. Servs*, 801 F.2d 847 (6th Cir. 1986)). When a

claimant's pain is caused by fibromyalgia, however, this test is nearly impossible to meet

because of the general lack of objective medical evidence. *See Rogers v. Comm'r of Soc. Sec.*,

486 F.3d 234, 243 (6th Cir. 2007) ("[W]e have recognized that fibromyalgia can be a severe

impairment and that, unlike medical conditions that can be confirmed by objective testing,

fibromyalgia patients present no objectively alarming signs"); *Swain v. Comm'r of Soc. Sec.*, 297

F. Supp. 2d 986, 990 (N.D. Ohio 2003) (noting that, due to the "elusive" and "mysterious" nature

of fibromyalgia, medical evidence confirming the severity of the alleged pain and diagnostic

findings confirming the severity of the impairment almost never exist). If objective medical

evidence does not substantiate the alleged intensity, persistence, and limiting effects of a

claimant's symptoms, the ALJ must look to the other evidence in the record. SSR 12-2p, 77 Fed.

Reg. at 43643; *see also* SSR 16-3p, 82 Fed. Reg. 49462, 49465 (Oct. 25, 2017) ("We will

consider an individual's statements about the intensity, persistence, and limiting effects of

symptoms, and we will evaluate whether the statements are consistent with objective medical

evidence and *the other evidence*." (emphasis added)).

The ALJ is not required to accept a claimant's subjective symptom complaints. *See*

*Jones*, 336 F.3d at 475–76. If an ALJ rejects a claimant's subjective complaints, she must

clearly state his reasons for doing so. *See Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994).

The ALJ may consider several factors, including the claimant's daily activities, the nature of the

claimant's symptoms, the claimant's efforts to alleviate his symptoms, the type and efficacy of

any treatment, and any other factors concerning the claimant's functional limitations and

restrictions. SSR 16-3p, 82 Fed. Reg. at 49465–66; 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3);

*see also Temples v. Comm'r of Soc. Sec.*, 515 F. App'x 460, 462 (6th Cir. 2013) (stating that an

26

ALJ properly considered a claimant's ability to perform day-to-day activities in determining whether his testimony regarding his pain was credible).  Nonetheless, an ALJ need not explicitly discuss each of the factors in his written decision.  *See Renstrom v. Astrue*, 680 F.3d 1057, 1067 (8th Cir. 2012) ("The ALJ is not required to discuss methodically each [factor], so long as he acknowledged and examined those [factors] before discounting a claimant's subjective complaints." (quotation omitted)).

The ALJ applied proper legal procedures in evaluating Shockley's subjective symptom complaints.  42 U.S.C. §§ 405(g), 1383(c)(3); *Elam*, 348 F.3d at 125; *Kinsella*, 708 F.2d at 1059. The ALJ clearly articulated that she rejected Shockley's subjective symptom complaints because they were "generally inconsistent with the record."  *Felisky*, 35 F.3d at 1036; *Jones*, 336 F.3d at 475–76; (Tr. 218).  In doing so, the ALJ did not rely solely on the lack of objective medical evidence supporting Shockley's alleged limitations.  *Rogers*, 486 F.3d at 243; *Swain*, 297 F. Supp. 2d at 990; SSR 12-2p, 77 Fed. Reg. at 43643; SSR 16-3p, 82 Fed. Reg. at 49465;(Tr. 215–18).  Instead, the ALJ properly assessed Shockley's subjective complaints based on their consistency with all the evidence in the record, including the medical evidence, a letter from Shockley's ex-boyfriend, and Shockley's own statements at the hearing and in clinical settings regarding her symptoms, activities, and treatment efforts.  20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); SSR 12-2p, 77 Fed. Reg. at 43643; SSR 16-3p, 82 Fed. Reg. at 49465–66; (Tr. 215–18).  Furthermore, Shockley's argument that the ALJ failed to provide sufficient analysis of each of the regulatory factors for evaluating subjective complaints is meritless, because: (1) the ALJ was not required to discuss each of the regulatory factors in rejecting Shockley's complaints; and (2) the ALJ analyzed the regulatory factors when she explicitly discussed Shockley's daily activities, treatment efforts, side effects from treatment, and statements to her

treatment providers. *Renstrom*, 680 F.3d at 1067; *Temples*, 515 F. App'x at 462; 20 C.F.R.

§§ 404.1529(c)(3), 416.929(c)(3); SSR 16-3p, 82 Fed. Reg. at 49465–66; (Tr. 215–18).

Substantial evidence also supported the ALJ's conclusion that Shockley's subjective

complaints were not entirely consistent with the other evidence in the record. 42 U.S.C.

§§ 405(g), 1383(c)(3); *Elam*, 348 F.3d at 125; *Kinsella*, 708 F.2d at 1059. Here, Shockley's

complaints that her pain limited her ability to stand and walk were inconsistent with:

(1) Dr. Mathur's and Dr. Ashkar's notes encouraging exercise; (2) physical therapy notes

indicating that she progressed well, except when she was non-compliant; (3) notes indicating that

she had a normal gait and ambulated well, including without an assistive device; (4) treatment

notes indicating that she had full range of motion without pain and no instability in her upper and

lower extremities; (5) notes indicating that her symptoms could be controlled through

medication, injections, and lifestyle changes, such as dieting and practicing good sleep hygiene;

(6) her own statements that she could walk between two blocks and a mile on a level surface; and

(7) Dr. Klyop's and Dr. Gallagher's opinions that she could walk up to 4 hours in an 8 hour day.

(Tr. 332, 342, 357–59, 856, 859, 893, 896, 901, 904, 906, 914, 916, 941, 987, 1006, 1019, 1021,

1032, 1111–12, 1118, 1123, 1127, 1131, 1143, 1147, 1161, 1163–64, 1167, 1170, 1235, 1374,

1379–80, 1382–83, 1386–87, 1390–91, 1393–94, 1402, 1406, 1435, 1481, 1498, 1417–18, 1431,

1514, 1521–22, 1526, 1529, 1533–34, 1538, 1540, 1543, 1561, 1564–65,1572, 1613, 1622–24,

1640–41, 1647, 1653–54). Further, Shockley's allegations that her neck, shoulder, and hand

pain prevented her from engaging in daily living activities, forced her to rely on others, and made

her unable to concentrate were inconsistent with: (1) Shockley's comments to her mental health

counselor that she worked as a nanny for three different families in 2016 and planned to sell her

house and move into an apartment; (2) her comments to Dr. Suri, Dr. Evans, and PA Mitchell

that she could cook clean, take care of herself, drive, stretch, shower, and run errands; (3) notes indicating that she had full strength in her upper and lower extremities; (4) Dr. Boutros's notes indicating that she could babysit her grandson; (5) Dr. Hazen's and Dr. Dengle's notes indicating that her carpal tunnel syndrome improved after surgery; and (6) Dr. Haidar's and Dr. Evans' notes indicating that she had good concentration and normal domestic skills. (Tr. 823–24, 826, 880, 882–84, 914, 916, 987, 1006, 1019, 1021, 1481, 1498, 1540, 1553, 1606, 1613, 1622–23, 1659, 1706, 1710, 1712, 1714). Finally, Shockley's allegations that she no longer socialized were inconsistent with: (1) Dr. Haidar's and nurse Fior-Nossek's notes indicating that she was cooperative, controlled her anger well, and did not show any anxiety during her treatment; (2) Shockley's statements that she vented to her neighbor when her neighbor came over to help with chores; and (3) her comments to Dr. Evans that she got along well with coworkers and supervisors. (Tr. 311, 823–24, 826, 881, 1478). Thus, even if the evidence in the record could support a different result, the ALJ's conclusion that Shockley's subjective complaints were inconsistent with the record fell within the Commissioner's "zone of choice" because it was reasonably drawn from the record. *Elam*, 348 F.3d at 125; *Rogers*, 486 F.3d at 241; *Mullen*, 800 F.3d at 545.

## VI.     Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Shockley's applications for disability insurance benefits and supplemental security income be AFFIRMED.

Dated: December 3, 2018

Thomas M. Parker
United States Magistrate Judge

---

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).  See also *Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).